UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| THOMAS O. EIFLER, SR. ) | CHAPTER 11 |
| ) | |
| Debtor ) | CASE NO. 17-31862- THF |
| ) | |

**RESPONSE TO CREDITOR, ARDIS E. GREENAMYER'S MOTION TO DISMISS**

\* \* \*   \* \* \*   \* \* \*

Comes the Debtor, Thomas O. Eifler, Sr. (the "Debtor"), by counsel, and for his Response to Creditor, Ardis E. Greenamyer's Motion to Dismiss (the "Motion to Dismiss") respectfully shows the Court as follows:

### I. BACKGROUND

The bankruptcy filing in this case followed after a state court judgment was entered against Debtor, Thomas O. Eifler, Sr. That state court case was primarily a dispute between Greenamyer and Debtor's son, Thomas O. Eifler, *Jr.*

Greenamyer filed a lengthy *pro se* complaint against Eifler, *Jr.* that contained a claim for declaration of ownership of the Eifler Entities; a claim for breach of fiduciary duties; a claim for compensation and expenses; and a claim for foreclosure of liens against various banks. That original complaint also contained a claim against Eifler, Sr. for aiding and abetting Eifler Jr.'s alleged breach of fiduciary duties. These overlapping claims arose from the same core allegations: that Greenamyer and Eifler, *Jr.* entered into a written, but secret, contract to form a crane and hoist company, which Greenamyer would run and one day become an equal owner of; that Eifler, *Jr.* breached that agreement by excluding Greenamyer from the company without giving him a 50% ownership stake; and that Eifler, *Jr.* failed to pay Greenamyer a salary or reimburse him for expenses he incurred on behalf of the companies.

The Jefferson Circuit Court initially dismissed all claims with prejudice but, at Greenamyer's request, reconsidered and reinstated them. Greenamyer then obtained counsel, who tendered a First Amended Complaint containing nine causes of action: (1) breach of oral and written contract; (2) promissory estoppel; (3) Fraud; (4) quantum meruit; (5) conversion; (6) wage and hour claims; (7) breach of fiduciary duty; (8) tortious interference with contractual and prospective contractual relationships; and (9) punitive damages.

Eifler, Sr. is only mentioned once in the First Amended Complaint, in a paragraph alleging that he "aided and abetted Eifler, Jr. in his breach of fiduciary duties owed to the Plaintiff…." First Amended Complaint (¶ 26). At the close of the evidence in the case, the trial court dismissed all claims alleging breach of fiduciary duties. *See* Trial Video, 6/7/16; 3:05:57-3:07:13 PM.  Thus, none of the surviving claims of the operative complaint even mentioned Eifler, Sr.

Moreover, at trial, Greenamyer offered minimal evidence—at best—against Debtor. First, Greenamyer testified that, during an argument, Debtor ordered him to leave the premises where the crane and hoist business operated (a building Debtor owned and used for his investment business), and threatened to call the police if he did not do so. Trial Video, 6/1/16; 2:44:30 PM. Although Greenamyer has described this action as Debtor kicking him out of the *business*, it is undisputed that Greenamyer came back to the building the very next day and continued his work for, and efforts to acquire, the Eifler Entities.

Second, Greenaymer noted at trial that Debtor served as the "grantor" of a "Delaware Dynasty Trust" that was created to hold the assets of the Eifler Entities (so that Greenamyer could shield those assets from a former business partner and Eifler, Jr. could shield them during a potential divorce proceeding). The creation of that trust was required by the contract that Greenamyer and Eifler, Jr. drafted and executed. Debtor's only action as "grantor" of that trust was to make an initial

2

deposit of $5,000, which was promptly returned to him.

Finally, Greenamyer relied on the double-hearsay testimony of Mary Louise Padden, who (by her own admission) dated Greenamyer "on-and-off for about ten years" (Trial Video, 6/6/16; 1:10:49 PM), including at the time the Eifler Entities were formed. She stated that, during the time Greenamyer and some other potential investors were trying to buy the companies, Eifler, Jr. told her: "my dad and my brother say I don't have to give Ardie anything but it's not right. I want to sell everything and give Ardie half of it because it's the right thing to do." Trial Video, 6/6/16; 1:44:45 PM.

That was the extent of the evidence offered against Debtor in the state court trial. Nevertheless—and despite the dismissal of all claims in the First Amended Complaint that actually referenced Debtor—the trial court instructed the jury (over Debtor's objection) that it could find him liable on a range of claims, including: tortious interference with contract, tortious interference with prospective contractual rights; aiding and abetting his son's alleged fraud, civil conspiracy, and punitive damages. The jury did just that. It assessed over $3 million in compensatory damages, and $5 million in punitive damages, against Eifler, Jr., as well as $2.2 million in compensatory damages, and $2.75 million in punitive damages, against Debtor.

Debtor filed a timely motion for a judgment notwithstanding the verdict ("JNOV"), or in the alternative, for a new trial. On December 14, 2016, the Jefferson Circuit Court issued an order that denied Eifler, Sr.'s motion for JNOV and for a new trial. That order addressed only three discrete issues. Despite the lengthy briefing oral argument, the court did not even mention—let alone resolve—numerous threshold questions, including whether plaintiff can recover tort damages and contract damages for the same underlying injury or whether punitive damages are appropriate in a case, like this, that ultimately rests on a breach of contract claim. Debtor was then left with only a

3

single option: to pursue a lengthy and expensive appeal just to have a court actually consider, for the first time, whether it was proper for the jury to award multiple, overlapping sets of damages awards against Eifler Jr. and Debtor—including punitive damages—for what ultimately boils down to a single injury: Eifler, Jr.'s failure to give Greenamyer the benefit of an alleged contractual bargain.

Faced with a $5,038,000 judgment that he could not afford to stay pending appeal, Debtor filed a motion to reduce or eliminate the supersedeas bond requirement. While that motion was pending, Greenamyer began garnishing the Debtor's accounts. Ultimately, Greenamyer collected approximately $42,000 from two of Debtor's accounts, with other garnishments pending.

The Jefferson Circuit Court then denied Debtor's motion, and Debtor was unable to post a supersedeas bond to stay execution of that multi-million judgment pending appeal. Faced with the likely inability to pay his debts as the same became due as a result of the continuing garnishments, Debtor was forced to seek bankruptcy relief.

## II. FACTS

1. On December 14, 2016, Judge Brian Edwards with the Jefferson Circuit Court issued his *Order and Opinion Denying in Part and Granting in Part Defendant Thomas O. Eifler, Sr.'s Motion for Judgment Notwithstanding the Verdict, or in the Alternative, for a New Trial, or in the Alternative, to Amend the Judgment* entering judgment against Debtor in the amount of $5,038,000.00 (the "Judgment").

2. On December 22, 2016, immediately following entry of the Judgment, Debtor filed his *Defendants' Motion to Amend the Judgment to Reduce Post-Judgment Interest Rate, To Correct the Judgment Date, and to Excuse or Reduce the Supersedeas Bond Requirement* (the "Motion to Amend"). As partial grounds for the request and due to the impossibility of an individual to secure a bond of that size, Debtor indicated that he would be forced to seek bankruptcy protection which

4

would be "personally and professionally disastrous." He further expressed his concern that he would suffer "financial ruin" waiting for an adjudication before the appellate court which would render his appellate rights illusory.

3. On January 9, 2017, the trial court heard oral argument on the Motion to Amend and indicated that it would render a decision quickly.

4. On January 10, 2017, Debtor filed his *Notice of Appeal*.

5. On March 9, 2017, Greenamyer began his barrage of post-judgment garnishments and levies which continued until Debtor was forced to file bankruptcy.

6. On March 14, 2017, Judge Brian Edwards recused himself from the matter based upon his wife's law firm entering an appearance in the case on behalf of Debtor. The case was reassigned to Judge McKay Chauvin.

7. On May 15, 2017, the trial court entered its opinion and order denying the elimination or reduction in the posting of a supersedeas bond.

8. Debtor is a licensed broker and financial advisor, beginning in the field in 1973.

9. In February 2017, and as a result of the judgment, Debtor's relationship with The Investment Center, Inc., with which he had been associated since 1999, was terminated. The Debtor found new employment at J.J.B. Hilliard, W.L. Lyons, LLC.

10. On June 6, 2017 (the "Petition Date"), Debtor filed his voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Pursuant to Sections 1107(a) and 11081 of the Bankruptcy Code, Debtor continues to operate the estate's business and manage its property as a debtor in possession.

11. No trustee, examiner, or committee of any kind has been appointed in connection

5

with this chapter 11 case.

## III. ARGUMENT

The main thrust of Greenamyer's Motion to Dismiss is that Debtor's Chapter 11 filing was triggered by the state court proceedings. Eifler does not deny that the cataclysm of events following the adverse ruling triggered the bankruptcy filing. That is likely the most frequent reason most debtors file bankruptcy: adverse judgments rendering them insolvent and unable to pay their debts as the same become due. *See In re Texaco, Inc.*, 254 B.R. 536, 541 (Bankr. S.D.N.Y 2000) ("Texaco filed under Chapter 11 for the sole purpose of compromising a $10.5 billion judgment.")

"'To begin with, filing a chapter 11 case because of the crushing weight of a judgment is not unusual.' Giving debtors the opportunity to reorganize in response to impending financial distress is the purpose of a chapter 11. The fact that this financial distress was brought on by litigation rather than borrowing is not dispositive." *In re Hyatt*, 479 B.R. 880, 895 (Bankr.D.N.M. 2012), quoting, *Marshall v. Marshall (In re Marshall)*, 403 B.R. 668, 690 -691 (C.D.Cal. 2009). A case is not filed in bad faith to avoid a judgment when the debtor is in financial distress and has the intention of reorganizing. *Marshall*, 403 B.R. at 691 (citing *In re Cohoes*, 931 F.2d 222, 228 (2d Cir. 1991)).

In the current circumstances, with the state court judgment against Debtor, he will need to file a plan of reorganization which exceeds what creditors would get in a liquidation of his assets. His assets total approximately $2.4 million and his liabilities exceed $6 million. Mr. Eifler remains gainfully employed and drawing income and distributions which can be utilized to fund a plan of reorganization. The Court should not dismiss the case at this early stage. "Denial of access to bankruptcy relief at the initial stages of the proceeding is inherently drastic and should not be employed as an easy alterative to other post-petition creditor remedies." *In re Fox*, 232 B.R., 237

---

[1] All statutes cited herein refer to the Bankruptcy Code unless otherwise specified.

6

(Bankr.D.Kan. 1999).

### A.   This Chapter 11 Case Cannot be Characterized as an Avoidance of Bond

"It is generally accepted that a bankruptcy case will not be dismissed, even when used as a substitute for an appeal bond, when the debtor has made diligent efforts to post such a bond but failed." *In re Dilling*, 322 B.R. 359, 362 (Bankr.N.D.Ill. 2005). On the contrary, dismissal is only warranted where—and *unlike* here—the debtor has sufficient assets to post an appeal bond but chooses not to use them for that purpose. *See, e.g.*, *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828-9 (9th Cir. 1994) (where debtor had sufficient assets to satisfy judgment, it was improper for debtor to file chapter 11 petition simply to delay collection of judgment and avoid posting appeal bond); *Argus Group 1700 v. Steinman,* 206 B.R. 757, 763 (E.D. Pa. 1997) (dismissal warranted where debtor was solvent and simply sought a better forum for ongoing litigation); *see also In re Smith*, 58 B.R. 448, 449-450 (Bankr. W.D. Ky. 1986) (dismissing where a "solvent sole proprietor with a single judgment creditor" wished to relitigate without posting a bond even though it was "obvious . . . [the debtor] could have paid the entire amount owed . . . .").

Here, Debtor could not pay the judgment or post the full amount of the bond. CR 73.04(2) requires "the amount of the bond shall be fixed at such sum as will cover the whole amount of the judgment remaining unsatisfied, costs on the appeal, interest, and damages for delay, unless the trial court after notice and hearing and for good cause shown fixes a different amount or orders security other than the bond." The Debtor's $2.4 million in assets, even if liquidated for that amount, could not procure a bond for $5 million Judgment (which likely would cost more than $6 million to procure). The Debtor requested the reduction or elimination of the bond requirement to no avail. Debtor withstood post-judgment collection efforts for three months before he finally was forced into a Chapter 11 filing.

7

"Because Debtor was unable to obtain the bond, and was forced to file bankruptcy in order to preserve his companies as going concerns, the Court will not dismiss his bankruptcy for that reason alone." *Fox,* 232 B.R. at 235. Bankruptcy courts would dismiss a case only where the debtor could have but chose not to post a bond. In this case, however, there is nothing else the Debtor could have done.

Debtor has already suffered substantially as a direct result of Greenamyer's actions. For one thing, the Debtor's longstanding relationship with The Investment Center, his broker/dealer, was terminated, requiring his clients to be transitioned to Hilliard Lyons. If this Court were to dismiss the case, even more harm would follow. Even assuming the appeal could continue from a technical standpoint absent the automatic stay, the Debtor would be forced to see the savings built up over a lifetime evaporate, and subject himself and, potentially, his investment business, to ongoing collection actions during the pendency of the appeal. Even success on appeal would not unscramble the egg, such that the Debtor could never be returned to his current position after all his assets were seized and sold. Greenamyer, meanwhile, suffers no injury in this case other than that suffered by every unsecured creditor in a bankruptcy case: he has to wait until his claim is allowed for payment.

This case is similar to *In re Dilling* wherein the court determined "it is not unreasonable to conclude that Dilling's appeal might succeed. Accordingly, it is important to balance the rights of Dilling with the rights of Doe, her principal creditor." *Id.*, citing, *In re N.R. Guaranteed Retirement, Inc.* 112 B.R. 263, 274 (N.D.Ill. 1990).2

The Court should deny the Motion to Dismiss to the extent it is premised on the Debtor's

---

[2] As noted above, Debtor has raised substantial appellate arguments, including the argument that *all* of the damages against him should be vacated because they are cumulative of the contract damages awarded on claims against Eifler, Jr., and the argument that punitive damages are inappropriate in a case, such as this, where the only injury alleged is a failure to honor the terms of a contract.

inability to post an appellate bond.

### B.     Debtor Has Not Exhibited Bad Faith in Transferring Assets

Whether the Debtor transferred assets pre-petition is one of fourteen different factors this Court has identified in determining whether a petition is filed in bad faith. *In re Smith*, 468 B.R. 235, 239 (Bankr. W.D. Ky. 2012). Transferring assets is not the equivalent of "hiding" assets or attempting to abuse the bankruptcy process. Until the Chapter 11 filing, Debtor could freely move his assets as he saw fit. The complaint about the Legacy Bank account in Texas rings hollow. The funds were still in Debtor's name in a bank account owned by Debtor and were easily traceable. That can hardly be characterized as "conspicuous." They were in plain sight, in his name, in a bank account owned by him. With regard to funding his son's appeal, the judgment against Debtor is so intertwined with the judgment against Eifler, Jr. that he had little choice but to fund the appeal of both judgments for Debtor's own personal benefit. When an appellate court determines Eifler, Jr. committed no wrongdoing, it must necessarily follow that the Debtor aided and abetted in no wrongdoing.

The Debtor's transfers to his spouse and his children likewise do not evidence bad faith. He, as had been his practice, provided for his family and gave to charity. The Debtor did not shed himself of assets between the Judgment on July 25, 2016, and the Petition Date. At most, he continued his prior practice. These transfers did not cause the Debtor to become unable to pay the Judgment. He was never close to having the ability to pay it.

### C.     The Chapter 11 Filing is Not a Simple Two-Party Dispute.

The Chapter 11 filing is more than a simple two-party dispute. As is shown by the attached affidavits of creditors, there is not only one substantial debt. Wilson & Muir Bank was, prior to the Judgment, the Debtor's largest creditor with claims of $1,123,966.95, and Bruce Madison hold a

claim for contribution that is becoming non-contingent each month as he is forced to fund the Wilson & Muir obligations. These creditors, whose affidavits are attached hereto as Exhibit A and Exhibit B, support the Debtor's Chapter 11 filing due to the debts he owes to them (the "Supporting Creditors"). The rationale behind this support is obvious: without the Chapter 11 filing, Greenamyer will continue his quest of liquidating Eifler's assets thereby preventing payment on debts owed to other creditors.

While the Judgment is large compared to the Debtor's assets and other liabilities, Wilson & Muir alone stands to receive approximately 17% of all payments to unsecured creditors. Its support for this petition demonstrates that an orderly reorganization or liquidation allows for all creditors to meaningfully participate in some payment under the terms of the Plan rather than one creditor taking it all.

### D.   This Chapter 11 Preserves Assets of the Estate.

Debtor is a businessman and is continuing to operate his business affairs as he always has and continuing to engage counselors as he deems necessary to represent him, his interests, and his businesses. This cannot be said to be diminishing assets. Mr. Eifler is protecting assets for the equitable distribution among creditors. Mr. Eifler has enjoyed being a successful business man for over fifty years. Being an investment advisor, it should come as no surprise that he has made sound investments over the years which yield returns allowing Mr. Eifler to continue "business as usual" while he reorganizes and appeals the judgment.

The Debtor intends to sell his book of business and obtain payments over a period of years in order to maximize the value of his client base, and has sought to employ special counsel to aid in this sale. "[O]rderly liquidation, combined with payments from post-petition income, can form the basis for a confirmable plan in this case." *Fox*, 232 B.R. at 235

If Greenamyer's claim is allowed, the Debtor's disposable income will pay what it can. The Debtor is further motivated to maximize the value of the estate for the creditors' benefit, since that value will benefit the Debtor in the event Greenamyer's claim is disallowed. This Chapter 11 will ensure the maximum return for creditors, since all creditors, not just Greenamyer, will share in the estate.

## CONCLUSION

Wherefore, based upon the above and forgoing, Debtor respectfully requests that this Court deny Greenamyer's Motion to Dismiss.

Respectfully submitted,

*/s/ James E. McGhee III*
CHARITY B. NEUKOMM
JAMES E. MCGHEE III
KAPLAN & PARTNERS LLP
710 West Main Street
4th Floor
Louisville, Kentucky 40202
E-mail: cneukomm@kplouisville.com
E-mail: jmcghee@kplouisville.com
*Counsel for Debtor*

## **CERTIFICATE OF SERVICE**

It is hereby certified that on August 29, 2017, true and correct copies of the foregoing were served on (a) the Court's CM/ECF system, (b) electronic mail to an address provided by the person to receive notice, (c) or first-class mail.

                                        */s/ James E. McGhee III*
                                        JAMES E. McGHEE III
                                        CHARITY B. NEUKOMM